EXHIBIT B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

FILED

JUN - 1 2006

U. S. DISTRICT COURT
EASTERN DISTRICT OF MO

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>BETONSPORTS PLC, its predecessors, )<br>holding companies, subsidiaries and associated )<br>entities; GARY STEPHEN KAPLAN, also )<br>known as Greg Champion; NEIL SCOTT )<br>KAPLAN, also known as Scott Kaye; LORI )<br>BETH KAPLAN MULTZ, also known as Beth; )<br>DAVID CARRUTHERS; PETER WILSON; )<br>NORMAN STEINBERG, also known as Tom )<br>Miller and David Norman; TIM BROWN, also )<br>known as Matt Brown; DIRECT MAIL )<br>EXPERTISE, INC.; DME GLOBAL )<br>MARKETING & FULFILLMENT, INC.; )<br>MOBILE PROMOTIONS, INC.; WILLIAM )<br>HERNAN LENIS; WILLIAM LUIS LENIS; )<br>MANNY GUSTAVO LENIS, and MONICA )<br>LENIS, )<br>Defendants. )<br>) | No. 4:06CR00337CEJ<br><br>18 U.S.C. § 1962(d) - Racketeering Conspiracy [Count 1, pp. 1-17]<br>18 U.S.C. § 1341 - Mail Fraud [Count 2, p. 18]<br>18 U.S.C. § 1084 - Transmission of Wagers/Wagering Information [Counts 3-12, pp. 18-19]<br>18 U.S.C. § 1953 - Interstate Transportation of Gambling Para. [Count 13, p. 20]<br>18 U.S.C. § 2 - Aiding and Abetting<br>26 U.S.C. § 7201 - Tax Evasion [Counts 14-16, p. 20-22]<br>26 U.S.C. § 7212(a) - Interference with Administration of Internal Revenue Laws [Counts 17-22, pp. 22-23]<br>Forfeiture pursuant to: 18 U.S.C. § 1963 [Forfeiture Count, p. 23] |

## INDICTMENT

The Grand Jury charges that:

### COUNT 1
(Racketeering Conspiracy)

At all times material to this Indictment, in the Eastern District of Missouri and elsewhere:

## Introduction

1. Beginning in approximately 1992, defendant GARY STEPHEN KAPLAN (hereafter "GARY KAPLAN") and others operated an illegal sports betting business in and near New York City. After GARY KAPLAN's arrest on New York State gambling charges in May of 1993, GARY KAPLAN relocated his illegal gambling operation to Florida, continuing to take sports wagers from bettors in New York by telephone. In approximately 1995, GARY KAPLAN moved the illegal gambling business to Aruba, in the West Indies, but continued to operate primarily in the United States. To facilitate its U.S. operations, the gambling businesses established and controlled toll-free telephone services and Internet web sites, and caused these services to accept sports wagers from gamblers in the United States. In about 1996-1997, GARY KAPLAN relocated the gambling operations to Antigua, and then to Costa Rica, leaving certain aspects of the financial operations in Antigua. Through all these relocations, GARY KAPLAN and the other defendants always operated, and caused the operation of their primary revenue-producing business, illegal sports wagering, in the United States.

2. Among the first Internet gambling businesses operated by GARY KAPLAN was a computer-based sports book called the North American Sports Association International, or NASA, which evolved into BETonSPORTS.COM. GARY KAPLAN and the other defendants advertised BETonSPORTS.COM as the largest online wagering service in the world. BETonSPORTS.COM and the other gambling web sites operated by GARY KAPLAN and his co-defendants offered gamblers in the United States illegal wagering on professional and college football and basketball, as well as many other professional and amateur sporting events and contests. These Internet gambling web sites also advertised toll free telephone numbers for

placing sports bets.

3. In July of 2004, BETONSPORTS PLC, a holding company, was incorporated under the laws of England and the United Kingdom. Defendant GARY KAPLAN, through a holding company called Boulder Overseas, retained approximately 44% of the BETONSPORTS PLC stock. In July of 2005, defendant GARY KAPLAN sold and caused the sale of 23,000,000 shares of BETONSPORTS PLC, retaining ownership of 15% of the BETONSPORTS PLC stock through Boulder Overseas.

**The Defendants**

4. Defendant GARY KAPLAN, also known as "Greg Champion" and "G," was the founder and primary operator of BETonSPORTS.COM and other Internet and telephone sports betting businesses.

5. Defendant NEIL SCOTT KAPLAN (hereafter "NEIL KAPLAN"), also known as "Scott Kaye," is defendant GARY KAPLAN'S brother. NEIL KAPLAN was an agent and/or employee of BETonSPORTS.COM, and, among other things, handled purchasing of goods and services.

6. Defendant LORI BETH KAPLAN MULTZ (hereafter "LORI KAPLAN MULTZ"), also known as "Beth," and "Beth Wilson," is GARY KAPLAN'S sister. LORI KAPLAN MULTZ was an employee and/or agent of BETonSPORTS.COM, who, among other things, arranged for advertising of the gambling web sites and telephone services.

7. Defendant DAVID CARRUTHERS was the Chief Executive Officer of BETonSPORTS.COM, and a Director of BETONSPORTS PLC.

3

8. Defendant PETER WILSON was the Media Director for BETonSPORTS.COM.

9. Defendant NORMAN STEINBERG, also known as "Tom Miller" and "David Norman" owned and operated, with defendant GARY KAPLAN, a number of Internet and telephone service gambling web sites, collectively known as the Millennium Group.

10. Defendant TIM BROWN, also known as "Matt Brown," is NORMAN STEINBERG's son-in-law, and, among other things, was an employee and/or agent of the Internet gambling web sites in the Millennium Group.

11. Defendants MOBILE PROMOTIONS, INC., DIRECT MAIL EXPERTISE, INC., and DME GLOBAL MARKETING & FULFILLMENT (referred to in a group as "the Lenis Companies"), were all Florida corporations, which operated cooperatively and shared use of bank accounts and financing. These companies provided promotional services to the illegal gambling web sites and telephone services operated by GARY KAPLAN and the other defendants.

12. Defendant WILLIAM HERNAN LENIS was an owner, officer and operator of the Lenis Companies.

13. Defendant WILLIAM LUIS LENIS is the son of WILLIAM HERNAN LENIS, and was an officer and operator of the Lenis Companies.

14. Defendant MONICA LENIS is the daughter of WILLIAM HERNAN LENIS, and was an officer and operator of the Lenis Companies.

15. Defendant MANNY GUSTAVO LENIS is the nephew of WILLIAM HERNAN LENIS, and was an employee of the Lenis Companies.

16. Defendant BETONSPORTS PLC is a publicly owned and traded holding company. BETONSPORTS PLC owned and operated BETonSPORTS.COM and other Internet and telephone sports gambling businesses operated illegally in the United States.

### The Enterprise

17. At least as early as 1992, and through the date of the filing of this Indictment, defendants GARY KAPLAN, NEIL KAPLAN, LORI KAPLAN MULTZ, DAVID CARRUTHERS, PETER WILSON, NORMAN STEINBERG, TIM BROWN, WILLIAM HERNAN LENIS, WILLIAM LUIS LENIS, MONICA LENIS, MANNY GUSTAVO LENIS, BETONSPORTS PLC, DIRECT MAIL EXPERTISE, INC., DME GLOBAL MARKETING FULFILLMENT & DISTRIBUTION, INC., MOBILE PROMOTIONS, INC. and others, known and unknown, constituted an "enterprise" (hereafter referred to as the "KAPLAN GAMBLING ENTERPRISE," or the "ENTERPRISE"), as defined by Title 18, United States Code, § 1961(4); that is, a group of entities and individuals associated in fact. The KAPLAN GAMBLING ENTERPRISE constituted an ongoing organization, whose members functioned as a continuing unit, for the common purpose of achieving the objectives of the ENTERPRISE. The ENTERPRISE was engaged in, and its activities affected, interstate and foreign commerce.

18. The KAPLAN GAMBLING ENTERPRISE operated a number of Internet web sites, hosted on servers located outside the United States, that did business in the United States by, among other things, offering, facilitating and conducting unlawful computer and telephone service based sports betting, and other forms of gambling. The KAPLAN GAMBLING ENTERPRISE caused the operation of toll-free telephone services to facilitate sports gambling, and take sports bets. THE KAPLAN GAMBLING ENTERPRISE created and disseminated false and fraudulent

advertising for its Internet gambling businesses throughout the United States.

19. In addition to the named defendants, members, associates and facilities of the KAPLAN GAMBLING ENTERPRISE included legal entities incorporated in the United States and other countries around the world. Some of these entities provided services to or otherwise supported the ENTERPRISE. The ENTERPRISE owned and controlled or had contractual rights entitling it to control domain names used to identify web sites that provided illegal gambling in the United States, or otherwise aided and abetted the ENTERPRISE's operations. These include:

(a) legal entities that operated as fronts for or supporters of the ENTERPRISE, and entities whose funding and services benefitted the ENTERPRISE's goals, included but were not limited to: BetonSports (Panama) S.A.; BetonSports (Costa Rica) S.A.; BetonSports (Antigua) Ltd. S.A.; BetonSports.com Ltd.; NASA International, Inc.; NASA Sports Books, Inc.; Millennium Sports; Mill Sports; Inversiones Millennium I y M S.A.; Corporacion Moishe; B. Holdings, Inc.; Boulder Investment; Brentail Internacional S.A.; J.S.I. Jaguar Sports International S.A.; Fergrant International S.A.; Lansford Inc.; Sports on the Internet, Ltd.; Gibraltar Sports Corp.; Infinity Sports International Corp.; Rock Island, Inc.; Bettors Trust; Best Line Sports; MVP; I Q Ludorum; Domain Choices; the International Sportsbook Council (ISBC) and the Offshore Gaming Association (OSGA).

(b) Corporate entities owned and/or controlled by ENTERPRISE members, included, but were not limited to, World Wide Credit; Barrio Holdings; Iguana Azul S.A.; Insiders Publishing; and Boulder Overseas.

(c) Entities operated under Internet-associated brand or trade names belonging to or controlled by ENTERPRISE members, included but were not limited to: BETonSPORTS.COM (also known as BetonSports, BetonSports.com and BoS.com); BoS; Bestline Sports International; betmill.com; BetonFantasy.com; BetonSports.com; Bettorstrust.com; Blue Grass Sports; Gibraltar Sports; Infinity Sports International; Jagbet.com; MVP Bets.com; Millennium Sports; NASA International Sportsbook; Rock Island Sports; and Wagermall.com.

(d) Domain names currently and formerly used to operate web sites owned and controlled by ENTERPRISE members, or otherwise used by or related to the ENTERPRISE, included but were not limited to those listed in Attachment A, and herein incorporated by reference.

20. A principal goal of the KAPLAN GAMBLING ENTERPRISE was to make money for the ENTERPRISE, its employees, members and associates, by maximizing the number of individuals in the United States who opened wagering accounts and used those accounts to place illegal bets on sports and sporting events with ENTERPRISE-controlled telephone service and Internet gambling web sites. It was also a goal of the ENTERPRISE to make money by maximizing the number of individuals residing in the United States who opened wagering accounts and gambled on casino-type games offered on ENTERPRISE-controlled Internet web sites.

21. Another goal of the KAPLAN GAMBLING ENTERPRISE was to evade the payment of federal wagering excise taxes due to the United States from the employees, members and associates of the ENTERPRISE.

## The Racketeering Conspiracy

22. Beginning no later than 1992 and continuing to the present, within the Eastern District of Missouri and elsewhere, defendants

> GARY STEPHEN KAPLAN, also known as "Greg Champion;"
> NEIL SCOTT KAPLAN, also known as "Scott Kaye;"
> LORI BETH KAPLAN MULTZ; also known as "Beth;"
> DAVID CARRUTHERS;
> PETER WILSON;
> NORMAN STEINBERG, also known as "Tom Miller" and "David Norman;"
> TIM BROWN, also known as "Matt Brown;"
> WILLIAM HERNAN LENIS, also known as "Bill Lenis";
> WILLIAM LUIS LENIS, also known as "Will Lenis";
> MANNY GUSTAVO LENIS;
> MONICA LENIS;
> BETONSPORTS PLC, its predecessors, holding companies, and associated entities,
> DIRECT MAIL EXPERTISE, a Florida corporation, its predecessors and successors;
> DME GLOBAL MARKETING & FULFILLMENT, INC., a Florida corporation, its predecessors and successors;
> MOBILE PROMOTIONS, INC., a Florida corporation, its predecessors and successors,

together with other persons known and unknown, being persons employed by and associated with the KAPLAN GAMBLING ENTERPRISE, which engaged in, and the activities of which affected, interstate and foreign commerce, knowingly and intentionally conspired to violate Title 18, United States Code, § 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the ENTERPRISE through a pattern of racketeering activity consisting of multiple acts in violation of statutes in Missouri [Mo. Rev. Stat. §§ 572.020 and 572.030]; Florida [Fla. Stat. ch. 849.25]; New York [N.Y.Gen. Oblig. § 5-401 and N.Y. Penal § 225.10]; New Jersey [N.J. Stat. Ann. §2C:37-2]; Washington [Wash. Rev. Code §§ 9.46.220 to 221; and 9.46.180] and Illinois [720 Ill. Comp. Stat. 5/28-1(a)(11)], and multiple acts indictable under:

(a) 18 U.S.C. § 1084 (the Wire Wager Act);

(b) 18 U.S.C. § 1341 (Mail Fraud);

(c) 18 U.S.C. § 1343 (Wire Fraud);

(d) 18 U.S.C. § 1952 (Interstate travel in aid of a Racketeering Enterprise);

(e) 18 U.S.C. § 1955 (Operation of an Illegal Gambling Business);

(f) 18 U.S.C. § 1953 (Interstate transportation of Gambling Paraphernalia); and

(g) 18 U.S.C. § 1956 (Money Laundering).

23. It was part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the ENTERPRISE.

<u>Manner, Method and Means of the Racketeering Conspiracy</u>

24. It was part of the conspiracy that the ENTERPRISE operated Internet web site and telephone gambling services from facilities physically located in San Jose, Costa Rica. The ENTERPRISE took wagers almost exclusively from gamblers in the United States. BETonSPORTS.COM promotional media materials, prepared and distributed by the ENTERPRISE, stated that in 2003, BETonSPORTS.COM had 100,000 active players, who placed 33 million wagers, worth over $1.6 billion dollars through the BETonSPORTS.COM web site. BETonSPORTS.COM promotional media materials prepared and distributed by the ENTERPRISE stated that in 2004, BETonSPORTS.COM had more than 2,000 inbound telephone lines, computer servers capable of handling 5,600 simultaneous web transactions, and more than 2,000 employees during peak gambling times such as the months preceding the Superbowl and March Madness. BETonSPORTS.COM promotional media materials publicly available in 2004 and 2005 stated that BETonSPORTS.COM had a state-of-the-art network infrastructure, and offered illegal Internet

and telephone service gambling through sportsbooks, an online casino, and "proposition" bets. BETonSPORTS.COM promotional media materials available in 2004 and 2005 stated that the web site took in an average of 63 bets per minute, "24/7/52," 98 percent of which came from bettors in the United States. All wagering originating in the United States which occurred on ENTERPRISE web sites and telephone services was illegal under federal law.

25. It was part of the conspiracy that in order to increase traffic and wagering on ENTERPRISE web sites and telephone services, the KAPLAN GAMBLING ENTERPRISE targeted U.S. gamblers, even though soliciting and accepting bets placed on sports and sporting events using interstate wire communications facilities was and is illegal in the United States, except where specifically authorized by federal law. The ENTERPRISE spent millions of dollars in the United States, advertising ENTERPRISE-controlled Internet web sites and telephone services in magazines, sports annuals and other sports publications, on sports radio, and on television.

26. It was part of the conspiracy that the KAPLAN GAMBLING ENTERPRISE operated various illegal gambling businesses. The ENTERPRISE conducted illegal Internet and telephone gambling operations throughout the United States, in violation of the laws of the United States. The KAPLAN GAMBLING ENTERPRISE solicited millions of illegal bets on sports and sporting events from gamblers in the United States, twenty four hours a day, three hundred and sixty five days a year. These bets, and information related to illegal bets placed with the KAPLAN GAMBLING ENTERPRISE-controlled entities, were transmitted via interstate and international telephone lines, and computers connected to the Internet.

27. It was part of the conspiracy to develop a scheme to defraud gamblers in the United States, by inviting, inducing and persuading them to place bets with the KAPLAN GAMBLING ENTERPRISE through its various Internet web sites and telephone lines. As part of the scheme, the members and associates of the KAPLAN GAMBLING ENTERPRISE created and disseminated advertising throughout the United States, which falsely stated that Internet and telephone gambling on sporting events and contests was "legal and licensed." The KAPLAN GAMBLING ENTERPRISE concealed the fact that the multiple web sites and telephone services through which it offered sports and casino style gambling were all owned and operated by the ENTERPRISE, and used to conduct the ENTERPRISE's illegal gambling businesses that were in fact not legal or licensed in the United States.

28. As part of the scheme to defraud, the KAPLAN GAMBLING ENTERPRISE used the United States mail system to deliver its fraudulent print advertising, and to cause bettors in the United States to send money to ENTERPRISE-controlled entities for the purpose of placing illegal bets. The KAPLAN GAMBLING ENTERPRISE used radio and television to deliver fraudulent advertising, through broadcasts and cable casts in and across the United States.

29. As part of the scheme to defraud, the KAPLAN GAMBLING ENTERPRISE controlled, in whole or in part, two entities called the Offshore Gaming Association ("OSGA") and the International Sportsbook Council ("ISBC"). The OSGA and the ISBC were advertised and represented to gamblers in the United States as independent watchdog agencies, whose purpose was to monitor online gambling to protect the wagering public. The ENTERPRISE actually used the OSGA and ISBC web sites to direct U.S. gamblers to ENTERPRISE-controlled web and telephone gambling sites, and to inhibit loss of funds to the ENTERPRISE that might otherwise

occur due to customer complaints or disputes.

30. It was part of the scheme to defraud and the conspiracy that the members and agents of the KAPLAN GAMBLING ENTERPRISE instructed individuals in the United States to send, or cause money to be sent to the ENTERPRISE, for the purpose of opening one or more gambling accounts. The ENTERPRISE instructed these individuals to send the money, intended to be used to place illegal wagers, to a named recipient other than directly to the ENTERPRISE web site or telephone line.

31. Another part of the conspiracy was to have the members and associates of the KAPLAN GAMBLING ENTERPRISE use interstate and international telephone and computer wire communications to illegally accept and record millions of sports wagers from gamblers in the United States, and to transmit information facilitating the acceptance of illegal wagers by KAPLAN GAMBLING ENTERPRISE web sites and gambling telephone services.

32. It was also part of the conspiracy that members and associates of the KAPLAN GAMBLING ENTERPRISE traveled and communicated across State and national borders, in aid of the ENTERPRISE and its operations, and purchased products and services in the United States, and caused them to be shipped to Costa Rica, and other locations outside the U.S. where the ENTERPRISE had physical facilities.

33. It was also part of the conspiracy that the members and associates of the KAPLAN GAMBLING ENTERPRISE transported gambling equipment across State and national borders, in aid of the ENTERPRISE and its operations.

34. Another component of the conspiracy was to have the members and associates of the KAPLAN GAMBLING ENTERPRISE launder money received by the ENTERPRISE in the form of illegal wagers and fees.

35. It was part of the conspiracy that the ENTERPRISE, its members and associates, used the U.S. and private mail services and wire transfer services to send money from ENTERPRISE components outside the United States to various recipients in the United States, and from the United States to recipients outside the United States, and between locations in the United States, in order to promote the ENTERPRISE's illegal telephone and Internet gambling operations.

### Overt Acts

36. In furtherance of the conspiracy, and to accomplish the objects of the conspiracy, the defendants and their co-conspirators, committed, among others, the following acts within the Eastern District of Missouri and elsewhere:

(1) On or about January 31, 2002, the KAPLAN GAMBLING ENTERPRISE operated a telephone service and Internet gambling web site called Millennium Sportsbook, and transmitted to potential and actual bettors in the Eastern District of Missouri, instructions for opening a wagering account with Millennium Sportsbook. The instructions stated that the money was to be sent from the United States to "Rod Jones" in Ecuador.

(2) On or about February 6, 2002, the KAPLAN GAMBLING ENTERPRISE operated a telephone service and Internet gambling web site called Gibraltar Sportsbook, and transmitted to potential and actual bettors in the Eastern District of Missouri, instructions for opening a wagering account with Gibraltar Sportsbook. The instructions stated that the money was to be sent from the United States to "Thomas Navas" in Ecuador.